Brandon J. Witkow (SBN 210443)
bw@witkowlaw.com
Cory A. Baskin (SBN 240517)
cb@witkowlaw.com
witkow | baskin
21031 Ventura Boulevard, Suite 603
Woodland Hills, California 91364
Tel:   818.296.9508
Fax:  818.296.9510

Attorneys for *Plaintiffs*
BLUE LOBSTER HOLDINGS, LLC &
EIRTH SYSTEMS, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUE LOBSTER HOLDINGS, LLC, a Nevada Limited Liability Company; EIRTH SYSTEMS, LLC, Nevada Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>G&C INVESTMENT CORP., a Florida Profit Corporation; NCW PROPERTIES, LLC dba NASCAR Car Wash, limited liability company; DEAN A. TOMICH, an individual; GARY WRIGHT, an individual; and DOES 1-10, inclusive,<br><br>Defendant. | Case No.:  2:17-cv-5897<br><br>**COMPLAINT FOR DAMAGES** |

Plaintiffs Blue Lobster Holdings, LLC ("Blue Lobster") and Eirth Systems, LLC ("Eirth") (Blue Lobster and Eirth are referred to herein as "Eirth" or "Plaintiffs") by and through its undersigned attorneys, sues Defendants G&C Investment Corp., NCW Properties, LLC dba NASCAR Car Wash, Dean A. Tomich, Gary Wright, and DOES 1-10, inclusive, and alleges as follows:

## The Parties

1. Plaintiff Blue Lobster Holdings, LLC is a Nevada limited liability company, authorized to do business in the State of California as a Foreign Limited Liability Company. Blue Lobster's principal place of business is 19510 Ventura Blvd., Suite 216, Tarzana, CA 91356. Joe B. Majarian and Sam Traznick, both citizens and residents of the State of California, are the managers of Blue Lobster.

2. Plaintiff Eirth Systems, LLC is a Nevada limited liability company, authorized to do business in the State of California as a Foreign Limited Liability Company.  Eirth's principal place of business is 19510 Ventura Blvd., Suite 216, Tarzana, CA 91356.  Joe B. Majarian and Sam Traznick, both citizens and residents of the State of California, are the managers of Blue Lobster.

3. Defendant G&C Investment Corp. ("G&C") is a Florida Corporation having a principal address of 1200 Brickell Ave., 18th Floor, Miami, Florida 33131. G&C's registered agent is Jorge Garrido and G&C maintains a registered office at 1200 Brickell Ave., 18th Floor, Miami, Florida, 33131.

4. Defendant NCW Properties, LLC dba NASCAR Car Wash ("NCW") is an Illinois limited liability company having a principal office at 2121 Oneida St., Suite 402, Joliet, IL 60435. NCW's registered agent is Dean A. Tomich and NCW maintains a registered office at 2121 Oneida St., Suite 402, Joliet, IL 60435.

5. Defendant Dean A. Tomich ("Tomich") is an individual and both a citizen and resident of the State of Illinois, who, at all times relevant to this action, acted as an agent, member, officer and/or director of G&C. Tomich is also a member and manager of NCW.

6.     Defendant Gary Wright ("Wright") is an individual and a citizen and resident of the State of Illinois who, at all times relevant to this action, acted as an agent, member, officer and/or director of G&C. Wright is also a member and manager of NCW.

7.     The true names and capacities of the defendants named herein as Does 1 through 10, inclusive, are unknown to Plaintiffs at this time.  Therefore, Plaintiffs sue said defendants by such fictitious names.  Plaintiffs will amend this complaint to allege these Defendants' true names and capacities when they have been ascertained. (Hereinafter, references to "Defendants" mean all defendants, including the Doe defendants.)

8.     Each of the Defendants sued herein is and was liable, in some manner, in whole or in part, for the wrongful, illegal, and tortious acts which have occurred and are ongoing, as alleged herein.  Plaintiffs are informed and believes, and thereon alleges that, at all times relevant hereto, each Defendant was the agent, servant, and/or employee of every other Defendant, and the acts of each Defendant were done within the course and scope of said agency, service, and/or employment with each of the other Defendants.  As such, each Defendant is jointly and severally liable for the tortious misdeeds and other misconduct of the other Defendants.

## Jurisdiction and Venue

9.     The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. §1332(a) in that Plaintiffs and all named Defendants in this action are citizens of different states such that complete diversity exists with respect to Plaintiffs and named Defendants. Furthermore, the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, as, *inter alia*, the agreement at issue in this case called for payment to be made by G&C in the amount of $16,500,000.00 in connection with the acquisition of a business and certain business assets; accordingly, Plaintiffs believe that their damages incurred as a result of Defendants' misconduct alleged in this action will exceed $75,000.00.

10.   The Court has personal jurisdiction over G&C related to this matter as, *inter alia*, it is a party to the contract at issue in this case - an Acquisition Agreement dated February 24, 2017 by and between G&C and Plaintiffs (hereinafter the "Agreement") wherein all parties agreed that the Agreement "shall be governed by the laws of the State of California, its rules of conflict of laws notwithstanding" and that all parties to the Agreement "agree and consent to be subject to the non-exclusive jurisdiction of the federal and state courts of the State of California in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby."

11.   The Court has personal jurisdiction over Tomich, as Tomich engaged in both tortuous and fraudulent conduct that directly impacted citizens and residents of the State of California, including Blue Lobster and Eirth, including, *inter alia*, (1) intentionally misrepresenting G&C and his personal financial ability and/or honest belief that the transaction at issue in this case would be completed, thereby causing Plaintiffs to forgo valuable opportunities in connection with Plaintiffs' businesses, (2) fraudulently inducing Plaintiffs to enter into a contractual relationship with Plaintiffs by making statements Tomich knew to be false when made, including that G&C or Tomich and Wright, as individuals, ever had the financial ability to complete the transaction involving the acquisition of Blue Lobster and Eirth; (3) negligently misrepresenting the fact that Plaintiffs intended to or had the financial ability to complete the transaction that is the subject of the Agreement; (4) upon information and belief, misrepresenting that he and Wright have any ownership interest in G&C or any authority to act on its behalf; and (5) by intentionally interfering with existing contractual relationships and prospective business relations, including those relationships existing between Eirth, on the one hand, and Rs2 Software, Plc ("Rs2") and UnionPay International ("UnionPay"), international bank card services and merchant payments providers, on the other hand.

12.   The Court has personal jurisdiction over Wright, as Wright engaged in both tortuous and fraudulent conduct that directly impacted citizens and residents of the State of California, including Blue Lobster and Eirth, including, *inter alia*, (1) intentionally misrepresenting G&C and his personal financial ability and/or honest belief that the transaction at issue in this case would be completed, thereby causing Plaintiffs to forgo valuable opportunities in connection with Plaintiffs' businesses; (2) fraudulently inducing Plaintiffs to enter into a contractual relationship with Defendants by making statements Wright knew to be false when made, including that G&C or Tomich and Wright, as individuals, ever had the financial ability to complete the transaction involving the acquisition of Blue Lobster and Eirth; (3) negligently misrepresenting the fact that Defendants intended to or had the financial ability to complete the transaction that is the subject of the Agreement; (4) upon information and belief, misrepresenting that he and Tomich have any ownership interest in G&C or any authority to act on its behalf; and (5) by intentionally interfering with existing contractual relationships and prospective business relations, including those relationships existing between Eirth, on the one hand, and Rs2 and UnionPay, on the other hand.

13.   The Court has personal jurisdiction over NCW, by virtue of the fact that Wright and Tomich, as owners and managers of NCW, acted on behalf of NCW with respect to the transaction at issue in this case, as (1) both Wright and Tomich communicated with Plaintiffs using nascarcarwash.com email accounts, including, but not limited to, during a time where G&C was not mentioned or referred to by Tomich; (2) upon information and belief, NCW would derive substantial benefit from Tomich and Wright's relationship with Rs2 and UnionPay in connection with their dealings with Eirth and the Agreement at issue in this case; and (3) NCW offered to "settle" the deal with Eirth by offering a NASCAR license for the "region of Canada" (upon information and belief held by NCW or a holding company associated with NCW).

14.   Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

### Factual Background

15.   Eirth is a full-service merchant processing company. Eirth focuses on simplified credit and debit card processing for domestic and international merchants.

16.   Upon information and belief, G&C Investment Corp. is a Real Estate Investment company with roots in Florida, and ties to countries on every continent around the world. According to the company website, in the past 8 years, G&C Investment Corp created REALTO TRADING, a company buying and selling commodities such as ICUMSA 45 Crystal White Sugar, and ICUMSA 800 -1200 Brown Sugar, ULSD - Ultra Low Sulphur Diesel Fuel D2, and JP54 Jet Fuel.

17.   Upon information and belief, NCW owns and operates Nascar Car Wash of Illinois, a business owned and managed by Tomich and Wright.

18.   On or about December 19, 2016, Tomich was introduced to Joe Majarian and Sam Traznick by a business agent, Derek Brenczewski ("Brenczewski"). During the December 19, 2016 introductory meeting, Tomich represented that he had a business partner, Wright, but that he had sole authority to enter into a transaction to acquire Eirth from Majarian and Traznick.

19.   During the December 19, 2016 meeting, Tomich indicated that he was "obtaining a $50 million fund" and was comfortable with an investment up to $20-$25M.  Tomich indicated that he was excited about the opportunity to acquire Eirth and that he was optimistic that the deal would close in mid-January 2017.  Tomich represented although he was presently purchasing other companies, he expected Eirth would be his "best performing asset" and would be moved to the top position for closing.  Upon information and belief, Tomich made these representations knowing they were false and with the intent of inducing Plaintiffs to proceed with the transaction to their ultimate detriment.

20.   Following the December 19, 2016 meeting, Tomich sent email correspondence to Majarian and Traznick using his <u>nascarcarwash.com</u> email account confirming the substance of the meeting and expressing optimism as to the proposed transaction. At no time during the meeting (or during the follow up email correspondence) was G&C mentioned.

21.   On January 4, 2017, Tomich and Majarian had a teleconference wherein Tomich represented that he is extremely excited about the opportunity, needed "majority control" over Eirth and expected that the executives of Eirth remain with the company after the deal to acquire Eirth was consummated.  Upon information and belief, Tomich made these representations knowing they were false and with the intent of inducing Eirth to proceed with the transaction to their ultimate detriment.

22.   During the January 4, 2017 teleconference, Majarian and Tomich arranged a meeting with Rs2 in connection with the Agreement.  Thereafter, in anticipation of the closing of the purchase transaction, Rs2 agreed to: (1) provide Eirth a co-sponsorship through one of the two sponsoring banks that Rs2 already had agreements with; (2) expedite the customization and deployment of the Eirth platform based upon Eirth specs; and, (3) loan Eirth an Rs2 Project Manager to interface with the Rs2 customization team and Eirth's clients, and train Eirth's personnel on the support and operation of the Rs2 platform during the customization and initial launch phases.  Partnering with Rs2 in this manner would have resulted in a significant expansion of Eirth's platform, business and value.

23.   On January 31, 2017, Majarian prepared a document entitled "Terms to Purchase 100% of EIRTH Systems, LLC and EIRTH Pay, LLC" which confirmed the key terms of the transaction heretofore discussed between Tomich, on behalf of G&C, NCW and Wright, and Plaintiffs (hereafter, the "Term Sheet").   Attached hereto as **Exhibit 1** is a true and correct copy of the January 31, 2017 Term Sheet.

The Term Sheet confirmed the total purchase price for Plaintiffs to be $16,500,00.00, and further provided that a "long form" purchase and sale agreement would be prepared.

24.   On February 2, 2017, a teleconference between Brenczewski, Tomich, Traznick and Majarian was held. During that teleconference, Tomich represented that ClearSky Capital and NCW Properties were finalizing an agreement to expand the NCW business.  Upon information and belief, Tomich made these representations knowing they were false, that no transaction was in place between these parties, and with the intent of falsely legitimizing NCW and/or G&C's stature and relationships in order to induce Plaintiffs to proceed with the transaction to their ultimate detriment.

25.   On the February 2, 2017 call, Tomich represented that he would likely partner with ClearSky Capital to close the deal to acquire Eirth. Tomich represented that G&C was being used merely as a "placeholder" for purposes of the Memorandum of Understanding and, according to Tomich, G&C would not acquire Eirth.  Upon information and belief, Tomich made these representations knowing they were false, that a "partnership" was not in place between these parties, and with the intent of falsely legitimizing his and G&C's stature and relationships in order to induce Plaintiffs to proceed with the transaction to their ultimate detriment.

26.   On February 22, 2017, a teleconference was held involving Brenczewski, Tomich and Majarian to discuss additional details relative to the transaction.  During that call, Tomich requested that Eirth prepare an initial draft of the acquisition contract.

27.   On February 24, 2017, Blue Lobster and Eirth executed an Acquisition Agreement with G&C (the "Agreement"). Tomich executed the Agreement on behalf of G&C as an "agent."  Attached hereto as **Exhibit 2** is a true and correct copy of the February 24, 2017 Acquisition Agreement.  The Agreement provided, in relevant part:

(a)    Pursuant to Section 1.2 of the Agreement, "[t]he Closing shall take place at such mutually agreeable time and date no later than seven (7) business days [from] the date the conditions to Closing set forth in Section 1.4 below are fulfilled or removed"; and

(b)    Pursuant to Section 2 of the Agreement, "The total consideration (the 'Purchase Price') to be paid by Buyer to Seller for the Units shall be $16,500,000.00 . . ."

28.    On March 10, 2017, a teleconference was held involving Tomich, Majarian, and Brenczewski.  During that call, Tomich represented for the first time, and never mentioned in the Agreement as a condition to closing, that the ClearSky/NCW deal was required to close before the purchase transaction provided for in the Agreement could close.  Upon information and belief, Tomich made these representations knowing they were false and with the intent of inducing Plaintiffs to proceed with the transaction to their ultimate detriment.

29.    On March 21, 2017, Tomich sent a text message to Majarian and indicated that he was "close on closing."

30.    On March 23, 2017, a further teleconference was held between Tomich, Majarian, and Brenczewski.  During that call, Tomich represented that the funds for the closing of the Eirth/G&C deal were "available through G&C already" but that Tomich preferred to close independently of G&C.  Upon information and belief, Tomich made these representations knowing they were false and with the intent of inducing Plaintiffs to proceed with the transaction to their ultimate detriment.

31.    Plaintiffs timely complied/disclosed all required information pursuant to the Agreement, including tax and financial statements on or about February 28, 2017, thus making the closing date 7 days later per Section 1.2 of the Agreement. At no time did any of the Defendants object to any of Plaintiffs' disclosures.

32.    Between March 24 and mid-April, Majarian, on behalf of Plaintiffs, on the one hand, and Tomich, on behalf of G&C, NCW and Wright, on the other hand,

had numerous discussions wherein Tomich assured Majarian that the purchase transaction was proceeding without interruption, including specifically: (a) Tomich represented that, *inter alia*, on April 20, that extending the closing through and including May 31, 2017 would be sufficient for them to "finalize internally" and that one-third of the funds for closing would be coming directly from Tomich and two-thirds of the funds for closing would be coming directly from Wright.

33.   On April 5, 2017, a teleconference was held between Tomich, Wright, Brenczewski, and Majarian. Wright was introduced by Tomich as his "partner." Tomich indicated that he and Wright would be merely "investors" in Eirth and that Majarian and Traznick would build the company. Wright stated that he would soon travel to Los Angeles, California in order to secure Executive Agreements with Majarian and Traznick.  Both Wright and Tomich stated that the Rs2 relationship and launch was of the utmost importance to them.

34.   On April 18, 2017, Wright indicated on a short teleconference that the agreement between ClearSky Capital, NCW Properties, Wright and Tomich would be closing within approximately 1 week, and a short extension was needed for the Eirth closing.

35.   On April 20, 2017, another teleconference was held. During this call, Wright and Tomich stated that an extension of the closing date, through and including May 31, 2017 would be required.  In a direct reversal of their March 23, 2017 representations, both Wright and Tomich stated that it was not their intent to close the acquisition of Eirth through G&C, that he only had "two-thirds" of the money required to close the acquisition and that Tomich had "one-third" of the money required to close the acquisition.  Upon information and belief, Tomich and Wright made these representations knowing they were false and with the intent of inducing Plaintiffs to proceed with the transaction to their ultimate detriment.

36.   On April 28, 2017, Wright and Majarian had a teleconference, wherein Wright stated that he was the "money guy" since "two-thirds" of the money required

to close the acquisition was coming from him, that he had no further intention of performing under the Acquisition Agreement, and that Majarian was welcome to close with another investor if he chose.

37.   During the April 28, 2017 call, Majarian stated to Wright that Eirth had relied on the promises made by Tomich and Wright, as agents for G&C and NCW, and Plaintiffs made promises and representations to Rs2, UnionPay and other partners that Eirth would be ready: (1) to begin hiring the personnel for the internal departments necessary to support full processing services; (2) to pay the final installment payment and begin customizing the Rs2 acquiring software necessary to launch full processing services in collaboration with the Rs2 team; (3) to begin the migration plans with the sales organizations to coincide with the launch of the services and the Closing of the Agreement; (4) hire the former VP of Sales for UnionPay International to head UnionPay sales on behalf of Eirth and, (4) to begin the technical integrations with sponsoring banks and other third-party affiliates as of the Closing date established by the Parties.

38.   Pursuant to Section 1.2 of the Agreement and both the April 20, 2017 teleconference and a May 1, 2017 email communication between Majarian, Traznick, Wright, and Tomich, the Closing Date under the Agreement was established to be May 31, 2017.

39.   By May 25, 2017, it became clear to Plaintiffs, including Majarian and Traznick, that Defendants were not planning to go forward with the Closing or keep any of the promises made under the Agreement.  Among other things, as of May 12, 2017, Tomich and Wright failed to wire the initial $1M as promised under the Agreement. Defendants' breach on this issue alone caused Majarian and Traznik to cancel a meeting the two had planned with Rs2 in Las Vegas. The purpose of the meeting with Rs2 was to "kick-start" the project which would have included finalizing the terms of the co-sponsorship through CRB (a bank with over $4 billion in tier-one capital that already had a sponsorship deal with Rs2).

40.   On May 25, 2017, Plaintiffs engaged counsel to send a letter to Defendants confirming that "EIRTH has satisfied all conditions of closing as specified in sections 4 of the Agreement, and is ready, willing and able to make the deliveries required at closing as specified in section 3 of the Agreement," and demanding that they immediately confirm closing of the transaction on or before May 31, 2017 (hereafter, the "Demand to Close Letter").   Attached hereto as **Exhibit 3** is a true and correct copy of the May 25, 2017 Demand to Close Letter.  No response to this letter was received, and no funds were wired by Defendants on or before May 31, 2017 to close the transaction.

41.   On May 31, 2017, Brenczewski called Majarian and indicated that he was authorized, on behalf of G&C, NCW, Tomich and Wright, to offer their NASCAR license for the "region of Canada" as settlement to Eirth for G&C/NCW's failure to perform under the Agreement. Majarian rejected the offer.

42.   As of the date of this Complaint, Defendants have not performed any of their obligations set forth in the Agreement and have not further communicated with Plaintiffs regarding the Agreement.

43.   As a direct consequence of Defendants' breach, Eirth was prevented from entering into Agreements with Independent Sales Organizations, agents and merchants to migrate their business as soon as the Eirth-G&C deal was consummated.  Eirth also lost valuable opportunities as a direct result of Defendants' breach, including the opportunity to customize the Eirth/Rs2 platform to the specific needs of the initial sales partners and launch with an established portfolio.  These business commitments would have easily established Eirth as a viable processor partner alternative and Eirth's valuation would have been in the hundreds of millions of dollars.

///

///

///

# FIRST CLAIM FOR RELIEF

## FRAUD/INTENTIONAL MISREPRESENTATION

### (By all Plaintiffs Against Tomich)

44.   Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 43, above.

45.   Tomich made false representations of material facts to, and concealed material facts from, Plaintiffs relative to the Agreement, including, *inter alia*, Tomich's financial ability to consummate the transaction at issue in this case, including, but not limited to, his representations that he had "one-third" of the money necessary to consummate the deal with Eirth – approximately $5,494,500.00 available to G&C, Tomich's representations that he and Wright could consummate the deal to acquire Eirth "independent of G&C," the entity (if any) that Tomich intended to use in order to consummate the transaction set forth in the Agreement (NCW, G&C or some other unnamed entity), and that NCW would derive significant benefits by establishing relationships with Rs2, UnionPay and other third party providers related to the Eirth/G&C deal.

46.   Tomich made such false representations and omissions with knowledge of their falsity and with the intent of inducing Plaintiffs to act upon those false representations or omissions.

47.   Plaintiffs reasonably relied on the false representations and concealment of material facts of Tomich by, *inter alia*, establishing relationships with and making promises to Rs2 and UnionPay.

48.   The wrongful acts and omissions of Tomich caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

49.   The acts and omissions of Tomich were deliberate, willful, oppressive, malicious, and fraudulent, and thereby justify an award of exemplary or punitive damages to Plaintiffs.

## SECOND CLAIM FOR RELIEF
## FRAUD/INTENTIONAL MISREPRESENTATION
(By all Plaintiffs Against Wright)

50.    Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 49, above.

51.    Wright made false representations of material facts to, and concealed material facts from, Plaintiffs relative to the Agreement, including, *inter alia*, Wright's financial ability to consummate the transaction at issue in this case, including, but not limited to, his representations that he had "two-thirds" of the money necessary to consummate the deal with Eirth - approximately $10,989,000.00 available to G&C, Wright's representations that he and Tomich could consummate the deal to acquire Eirth "independent of G&C," the entity (if any) that Wright intended to use in order to consummate the transaction set forth in the Agreement (NCW, G&C or some other unnamed entity), and that NCW would derive significant benefits by establishing relationships with Rs2, UnionPay and other third party providers related to the Eirth/G&C deal.

52.    Wright made such false representations and omissions with knowledge of their falsity and with the intent of inducing Plaintiffs to act upon those false representations or omissions.

53.    Plaintiffs reasonably relied on the false representations and concealment of material facts of Wright by, *inter alia*, establishing relationships with and making promises to Rs2 and UnionPay.

54.    The wrongful acts and omissions of Wright caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

55.    The acts and omissions of Wright were deliberate, willful, oppressive, malicious, and fraudulent, and thereby justify an award of exemplary or punitive damages to Plaintiffs.

witkow|baskin

### THIRD CLAIM FOR RELIEF
### FRAUD/INTENTIONAL MISREPRESENTATION
(By all Plaintiffs Against G&C)

56.    Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 55, above.

57.    G&C, by and through Wright and Tomich purporting to act as "agents" of G&C at all times relevant to this action, made false representations of material facts to, and concealed material facts from, Plaintiffs relative to the Agreement, including, *inter alia*, G&C's financial ability to consummate the transaction at issue in this case, including, but not limited to, representations made by Wright and Tomich – namely, that G&C ever had the resources to consummate the deal with Eirth and the true motivations for attempting to establish relationships with Rs2, UnionPay and other third party providers.

58.    G&C made such false representations and omissions with knowledge of their falsity and with the intent of inducing Plaintiffs to act upon those false representations or omissions.

59.    Plaintiffs reasonably relied on the false representations and concealment of material facts of G&C by, *inter alia*, establishing relationships with and making promises to Rs2 and UnionPay.

60.    The wrongful acts and omissions of G&C caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

61.    The acts and omissions of G&C were deliberate, willful, oppressive, malicious, and fraudulent, and thereby justify an award of exemplary or punitive damages to Plaintiffs.

///

///

///

## FOURTH CLAIM FOR RELIEF
## FRAUD/INTENTIONAL MISREPRESENTATION
### (By all Plaintiffs Against NCW)

62. Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 62, above.

63. NCW, by and through Wright and Tomich who acted as agents of NCW using their nascarcarwash.com accounts throughout the time each communicated in relation to the Agreement, made false representations of material facts to, and concealed material facts from Plaintiffs relative to the Agreement, including, *inter alia*, NCW's role with respect to the acquisition of Eirth as set forth in the Agreement, the material benefits that NCW would derive from the relationships formed with third parties relative to the Agreement; namely those with Rs2 and UnionPay, and the amount of remuneration referred to by Wright (who stated he had 2/3 of the money needed to consummate the deal) and Tomich (who stated he had 1/3 of the money needed to consummate the deal) that would come from the NCW company account.

64. NCW made such false representations and omissions with knowledge of their falsity and with the intent of inducing Plaintiffs to act upon those false representations or omissions.

65. Plaintiffs reasonably relied on the false representations and concealment of material facts of NCW by, *inter alia*, establishing relationships with and making promises to Rs2 and UnionPay.

66. The wrongful acts and omissions of NCW caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

67. The acts and omissions of NCW were deliberate, willful, oppressive, malicious, and fraudulent, and thereby justify an award of exemplary or punitive damages to Plaintiffs.

///

# FIFTH CLAIM FOR RELIEF
## BREACH OF CONTRACT
### (All Plaintiffs against G&C)

68.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 67 hereof.

69.   Plaintiffs and G&C entered into a valid and binding Agreement on or about February 24, 2017 related to the acquisition of Eirth.

70.   Tomich executed the agreement on behalf of G&C as the "agent" of G&C.

71.   Pursuant to Section 1.2 of the Agreement and the May 1, 2017 email communication between Majarian, Traznick, Wright, and Tomich, the Closing Date under the Agreement was established to be May 31, 2017.

72.   By May 25, 2017, it became clear to Plaintiffs, including Majarian and Wright, that Defendants were not planning to go forward with the Closing or keep any of the promises made under the Agreement.

73.   On May 25, 2017, Plaintiffs sent a letter to Wright and Tomich making clear that "EIRTH has satisfied all conditions of closing as specified in sections 4 of the Agreement, and is ready, willing and able to make the deliveries required at closing as specified in section 3 of the Agreement."

74.   On May 31, 2017, Brenczewski called Majarian and indicated that he was authorized to offer their NASCAR license for the "region of Canada" (upon information and belief, this "license" was an asset of NCW and/or a holding company relative to NCW) as settlement to Eirth. Majarian rejected the offer.

75.   As of the date of this Complaint, G&C has not performed any of their obligations set forth in the Agreement and have not further communicated with Plaintiffs regarding the Agreement.

76.   G&C has materially breached the Agreement by, *inter alia*, failing to perform any of its obligations and/or promises as set forth in the Agreement.

77.   As a direct and proximate result of G&C's breach of his contract, Plaintiffs have sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Plaintiffs are thereby entitled to the remedy of specific performance; that is, to require G&C to perform all of their obligations under the Agreement.

**SIXTH CLAIM FOR RELIEF**

**INTENTIONAL INTERFERENCE WITH**

**CONTRACTUAL AND/OR PROSPECTIVE ECONOMIC RELATIONS**

**(All Plaintiffs against Tomich)**

78.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 77 hereof.

79.   Plaintiffs have developed and maintain advantageous business relationships with third parties, including Rs2, UnionPay, and G&C. These entities represent a continuing probability of future economic benefit to Plaintiffs. Tomich has direct knowledge about these relationships.

80.   Upon information and belief, Tomich has intentionally, maliciously and improperly interfered with and continues to interfere with Plaintiffs' relationships with third parties, including Rs2, UnionPay, and G&C by, upon information and belief at this time, causing G&C to refuse to perform obligations under the Agreement, thereby preventing Plaintiffs from realizing opportunities and remuneration they would have otherwise received but for Tomich's misconduct.

81.   There was no privilege or justification for Tomich's conduct.

82.   Tomich's conduct as alleged herein causes and will continue to cause irreparable injury to Plaintiffs and entitles Plaintiffs to the remedy of specific performance. As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain damages, the exact amount of which is extremely difficult to calculate and is now unknown.

## SEVENTH CLAIM FOR RELIEF
## INTENTIONAL INTERFERENCE WITH
## CONTRACTUAL AND/OR PROSPECTIVE ECONOMIC RELATIONS
### (All Plaintiffs against Wright)

83.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 82 hereof.

84.   Plaintiffs have developed and maintains advantageous business relationships with third parties, including Rs2, UnionPay, and G&C. These entities represent a continuing probability of future economic benefit to Plaintiffs. Wright has direct knowledge about these relationships.

85.   Upon information and belief, Wright has intentionally, maliciously and improperly interfered with and continues to interfere with Plaintiffs' relationships with third parties, including Rs2, UnionPay, and G&C by causing G&C to refuse to perform its obligations under the Agreement. Among other things, after the Agreement was executed, Wright, an individual who Tomich stated was not a decisionmaker or even a necessary party with respect to the Agreement between Eirth and G&C, indicated that he was the "money guy" and affirmatively indicated that, if he wanted to, he could prevent G&C from performing its obligations under the Agreement. In fact, G&C has, to date, failed to perform any of its obligations under the Agreement. Wright's misconduct has thereby prevented Plaintiffs from realizing opportunities and remuneration they would have otherwise received but for Wright's misconduct.

86.   There was no privilege or justification for Wright's conduct.

87.   Wright's conduct as alleged herein causes and will continue to cause irreparable injury to Plaintiffs and entitles Plaintiffs to the remedy of specific performance. As a direct and proximate result of Wright's conduct, Plaintiffs have sustained and will continue to sustain damages, the exact amount of which is extremely difficult to calculate and is now unknown.

# EIGHTH CLAIM FOR RELIEF
## INTENTIONAL INTERFERENCE WITH
## CONTRACTUAL AND/OR PROSPECTIVE ECONOMIC RELATIONS
### (All Plaintiffs against NCW)

88.   Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1 through 87 hereof.

89.   Plaintiffs have developed and maintain advantageous business relationships with third parties, including Rs2, UnionPay, and G&C. These entities represent a continuing probability of future economic benefit to Plaintiffs. NCW has direct knowledge about these relationships.

90.   Upon information and belief, NCW, by and through Wright (who affirmatively indicated that he himself could prevent the agreed-upon deal between Eirth and G&C from moving forward) and Tomich (who, upon information and belief, allowed or instructed Wright to attempt to interfere with the deal between Eirth and G&C), as managers of NCW, has intentionally, maliciously and improperly interfered with and continues to interfere with Plaintiffs' relationships with third parties, including Rs2, UnionPay, and G&C by causing G&C to refuse to perform obligations under the Agreement. Upon information and belief at this time, NCW would derive significant benefits from the relationships formed with Rs2 and UnionPay and would have incentive to frustrate the negotiations between Eirth and G&C. NCW's interest is further established by virtue of the fact that on May 31, 2017, it authorized its NASCAR license (or a license held by a holding company associated with NCW) for the "region of Canada" to be offered to Eirth as consideration under the Agreement/settlement. This misconduct by NCW thereby prevented Plaintiffs from realizing opportunities and remuneration they would have otherwise received but for NCW's misconduct.

91.   There was no privilege or justification for NCW's conduct.

92.   NCW's conduct as alleged herein causes and will continue to cause irreparable injury to Plaintiffs and entitles Plaintiffs to the remedy of specific performance. As a direct and proximate result of NCW's conduct, Plaintiffs have sustained and will continue to sustain damages, the exact amount of which is extremely difficult to calculate and is now unknown.

## NINTH CLAIM FOR RELIEF
## UNFAIR COMPETITION
### (By Plaintiffs Against Tomich)

93.   Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 92, above.

94.   The actions of Tomich were unfair, unlawful, and fraudulent, in violation of Business and Professions Code section 17200.

95.   Plaintiffs have no adequate remedy at law for the injuries caused by the acts and omissions of Tomich, and is thereby entitled to restitution of any and all profits, revenues, compensation or other payments obtained by Tomich as a result of their unfair competition, including any relationships Tomich made with Rs2, UnionPay or G&C as a result of his misconduct.

96.   It is inequitable for Tomich to enjoy the benefits of G&C refusing to perform its obligations under the Agreement with Eirth. Any monies or property Tomich gained through unfair competition should be held in a constructive trust for the benefit of Plaintiffs.  Plaintiffs are further entitled to the equitable remedy of a constructive trust, specific performance, and an accounting to recover these assets.

## TENTH CLAIM FOR RELIEF
## UNFAIR COMPETITION
### (By Plaintiffs Against Wright)

97.   Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 96, above.

98.   The actions of Wright were unfair, unlawful, and fraudulent, in violation of Business and Professions Code section 17200.

99.   Plaintiffs have no adequate remedy at law for the injuries caused by the acts and omissions of Wright, and is thereby entitled to restitution of any and all profits, revenues, compensation or other payments obtained by Wright as a result of his unfair competition, including any relationships Wright made with Rs2, UnionPay, G&C, or any other third parties as a result of his misconduct.

100. It is inequitable for Wright to enjoy the benefits of G&C refusing to perform its obligations under the Agreement with Eirth. Any monies or property Wright gained through unfair competition should be held in a constructive trust for the benefit of Plaintiffs.  Plaintiffs are further entitled to the equitable remedy of a constructive trust, specific performance, and an accounting to recover these assets.

## ELEVENTH CLAIM FOR RELIEF

## UNFAIR COMPETITION

### (By Plaintiffs Against NCW)

101.  Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 100, above.

102.  The actions of NCW, through its managers – Tomich and Wright who used nascarcarwash.com accounts throughout the negotiations relative to the Agreement and acted as managers of NCW at all times relevant to this action – were unfair, unlawful, and fraudulent, in violation of Business and Professions Code section 17200.

103.  Plaintiffs have no adequate remedy at law for the injuries caused by the acts and omissions of NCW, and is thereby entitled to restitution of any and all profits, revenues, compensation or other payments obtained by NCW as a result of this unfair competition, including any relationships NCW made with Rs2, UnionPay, G&C, or any other third parties as a result of this misconduct.

104. It is inequitable for NCW to enjoy the benefits of G&C refusing to perform its obligations under the Agreement with Eirth. Any monies or property Wright gained through unfair competition should be held in a constructive trust for the benefit of Plaintiffs.  Plaintiffs are further entitled to the equitable remedy of a constructive trust, specific performance, and an accounting to recover these assets.

### TWELFTH CLAIM FOR RELIEF
### UNFAIR COMPETITION
### (By Plaintiffs Against G&C)

105.  Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 104, above.

106.  The actions of G&C, through Tomich and Wright, individuals who acted as "agents" of G&C throughout the negotiations relative to the Agreement – were unfair, unlawful, and fraudulent, in violation of Business and Professions Code section 17200.

107.  Plaintiffs have no adequate remedy at law for the injuries caused by the acts and omissions of G&C, and is thereby entitled to restitution of any and all profits, revenues, compensation or other payments obtained by G&C as a result of this unfair competition, including any relationships G&C made with Rs2, UnionPay, G&C, or any other third parties as a result of this misconduct.

108.  It is inequitable for G&C to enjoy the benefits of its failure to perform its obligations under the Agreement. Any monies or property G&C gained through unfair competition should be held in a constructive trust for the benefit of Plaintiffs. Plaintiffs are further entitled to the equitable remedy of a constructive trust, specific performance, and an accounting to recover these assets.

///

///

///

///

# THIRTEENTH CLAIM FOR RELIEF
# NEGLIGENT MISREPRESENTATION
### (By Plaintiffs Against Tomich)

109.  Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 108, above.

110.  Tomich made false representations of material facts to, and concealed material facts from, Plaintiffs relative to the Agreement, including, *inter alia*, Tomich's financial ability to consummate the transaction at issue in this case, including, but not limited to his representations that he had "one-third" of the money necessary to consummate the deal with Eirth – approximately $5,494,500.00, Tomich's representations that he and Wright could consummate the deal to acquire Eirth "independent of G&C," the entity (if any) that Tomich intended to use in order to consummate the transaction set forth in the Agreement (NCW, G&C or some other unnamed entity), and that NCW would derive significant benefits by establishing relationships with Rs2, UnionPay and other third party providers related to the Eirth/G&C deal.

111.  Tomich made such false representations and omissions with negligent, careless, or reckless disregard of the truth or falsity of the representations and omissions, but with the intent of inducing Plaintiffs to act upon those false representations and omissions.

112.  Plaintiffs reasonably relied on the false representations and concealment of material facts of Tomich by, *inter alia*, establishing relationships with and making promises to Rs2 and UnionPay.

113.  Tomich owed Eirth a duty not to make misrepresentations in connection with Tomich's potential or actual business dealings with Plaintiffs.

114.  Plaintiffs reasonably relied on the false representations and concealment of material facts of Tomich.

115. The wrongful acts and omissions of Tomich caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

116. It is inequitable for Tomich to enjoy the benefits of G&C not performing its obligations set forth in the Agreement. Any benefit that Tomich derived through this fraud should be held in a constructive trust for the benefit of Plaintiffs. Plaintiffs are entitled to the equitable remedy of a constructive trust, specific performance relative to the Agreement, and an accounting, to recover these assets.

**FOURTEENTH CLAIM FOR RELIEF**

**NEGLIGENT MISREPRESENTATION**

**(By Plaintiffs Against Wright)**

117. Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 116, above.

118. Wright made false representations of material facts to, and concealed material facts from, Plaintiffs relative to the Agreement, including, *inter alia*, Wright's financial ability to consummate the transaction at issue in this case, including, but not limited to his representations that he had "two-thirds" of the money necessary to consummate the deal with Eirth - approximately $10,989,000.00, Wright's representations that he and Tomich could consummate the deal to acquire Eirth "independent of G&C," the entity (if any) that Wright intended to use in order to consummate the transaction set forth in the Agreement (NCW, G&C or some other unnamed entity), and that NCW would derive significant benefits by establishing relationships with Rs2, UnionPay and other third party providers related to the Eirth/G&C deal.

119. Wright made such false representations and omissions with negligent, careless, or reckless disregard of the truth or falsity of the representations and omissions, but with the intent of inducing Plaintiffs to act upon those false representations and omissions.

120.  At all times material hereto, Wright represented himself to be an "agent" of G&C, a member of NCW, and as having nearly $11M individually to invest in the Eirth-G&C deal. Plaintiffs were therefore entitled to rely on representations made by Wright.

121.  Wright owed Eirth a duty not to make misrepresentations in connection with Wright's potential or actual business dealings with Plaintiffs.

122.  Plaintiffs reasonably relied on the false representations and concealment of material facts of Wright.

123.  The wrongful acts and omissions of Wright caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

124.  It is inequitable for Plaintiffs to enjoy the benefits of Wright not performing its obligations set forth in the Agreement.  Any benefit that Wright derived through this fraud should be held in a constructive trust for the benefit of Plaintiffs. Plaintiffs are entitled to the equitable remedy of a constructive trust, and an accounting, to recover these assets.

**FIFTEENTH CLAIM FOR RELIEF**

**NEGLIGENT MISREPRESENTATION**

**(By Plaintiffs Against G&C)**

125.  Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 124, above.

126.  G&C, by and through Wright and Tomich purporting to act as "agents" of G&C at all times relevant to this action, made false representations of material facts to, and concealed material facts from, Plaintiffs relative to the Agreement, including, *inter alia*, G&C's financial ability to consummate the transaction at issue in this case, including, but not limited to representations made by Wright and Tomich – namely, that G&C ever had the resources to consummate the deal with Eirth and the true

motivations for attempting to establish relationships with Rs2, UnionPay and other third party providers.

127.  G&C made such false representations and omissions with negligent, careless, or reckless disregard of the truth or falsity of the representations and omissions, but with the intent of inducing Plaintiffs to act upon those false representations and omissions.

128.  G&C, including its "agents" Wright and Tomich, owed Eirth a duty not to make misrepresentations in connection with G&C's potential or actual business dealings with Plaintiffs.

129.  Plaintiffs reasonably relied on the false representations and concealment of material facts of G&C.

130.  The wrongful acts and omissions of G&C caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

131. It is inequitable for G&C to enjoy the benefits of G&C's failure to perform its obligations set forth in the Agreement.  Any benefit that G&C derived through this fraud should be held in a constructive trust for the benefit of Plaintiffs. Plaintiffs are entitled to the equitable remedy of a constructive trust, and an accounting, to recover these assets.

**SIXTEENTH CLAIM FOR RELIEF**

**NEGLIGENT MISREPRESENTATION**

**(By Plaintiffs Against NCW)**

132.  Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 132, above.

133.  NCW, by and through Wright and Tomich who acted as agents of NCW using their nascarcarwash.com accounts throughout the time each communicated in relation to the Agreement, made false representations of material facts to, and concealed material facts from Plaintiffs relative to the Agreement, including, *inter*

witkow|baskin

*alia*, NCW's role with respect to the acquisition of Eirth as set forth in the Agreement, the material benefits that NCW would derive from the relationships formed with third parties relative to the Agreement; namely those with Rs2 and UnionPay, and the amount of remuneration referred to by Wright (who stated he had 2/3 of the money needed to consummate the deal) and Tomich (who stated he had 1/3 of the money needed to consummate the deal) that would come from the NCW company account.

134. NCW made such false representations and omissions with negligent, careless, or reckless disregard of the truth or falsity of the representations and omissions, but with the intent of inducing Plaintiffs to act upon those false representations and omissions.

135. NCW owed Eirth a duty not to make misrepresentations in connection with NCW's potential or actual business dealings with Plaintiffs.

136. Plaintiffs reasonably relied on the false representations and concealment of material facts of NCW.

137. The wrongful acts and omissions of NCW caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

138. It is inequitable for NCW to enjoy the benefits of G&C's failure to perform its obligations set forth in the Agreement.  Any benefit that NCW derived through this fraud should be held in a constructive trust for the benefit of Plaintiffs. Plaintiffs are entitled to the equitable remedy of a constructive trust, and an accounting, to recover these assets.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.   For general and special damages, plus interest, according to proof at trial;

2.   For an order requiring G&C to consummate the deal described more particularly in the Agreement between G&C and Eirth;

3.     For restitution and disgorgement of all any and all profits, revenues, compensation or other payments obtained by any of the Defendants;

4.     For an order restoring to Plaintiffs all property held by any of the Defendants in constructive trust, plus interest, according to proof at trial;

5.     For exemplary and punitive damages, according to proof at trial;

6.     For costs and attorneys' fees incurred by Plaintiffs in this action;

7.     For such other and further relief as the Court deems just and proper.

Dated:  August 9, 2017                    Respectfully submitted,

                                          witkow | baskin


                                          By: /s/ Brandon J. Witkow
                                                 Brandon J. Witkow

                                          Attorneys for *Plaintiffs*
                                          BLUE LOBSTER HOLDINGS, LLC &
                                          EIRTH SYSTEMS, LLC

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b), Federal Rules of Civil Procedure and Local Rule 38-1, Plaintiffs Blue Lobster Holdings, LLC and Eirth Systems, LLC hereby demand a trial by jury.

Dated:  August 9, 2017                    Respectfully submitted,

witkow | baskin

By: /s/ Brandon J. Witkow
        Brandon J. Witkow

Attorneys for *Plaintiffs*
BLUE LOBSTER HOLDINGS, LLC &
EIRTH SYSTEMS, LLC

witkow | baskin